IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GINA DIFLAVIS, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CHOICE HOTELS INTERNATIONAL, | : | |
| INC. *et al.*, | : | NO. 18-3914 |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                           FEBRUARY 3, 2020

### INTRODUCTION

During her brief tenure as a housekeeper at a Clarion Hotel, Gina DiFlavis alleges that she was not compensated for the overtime hours she regularly worked. She alleges that all other housekeepers working at Clarion Hotels across the nation were subjected to the same treatment. She brings a collective action under the Fair Labor Standards Act (FLSA)[1] and a class action under the Pennsylvania Minimum Wage Act (PMWA).[2] The defendants deny that Ms. DiFlavis worked in excess of 40 hours per week during any week of her employment. The defendants now move for summary judgment as to Ms. DiFlavis' overtime compensation claims.

Choice Hotels International, Inc. also moves for summary judgment on the basis that it is not Ms. DiFlavis' joint employer. Rama Construction Company owns and operates the Clarion Hotel in Essington, Pennsylvania where Ms. DiFlavis worked. Ms. DiFlavis asserts that Choice

---

[1]     Ms. DiFlavis brings this claim on an opt-in basis on behalf of herself and all Clarion Hotel housekeepers who have worked on a full-time, hourly basis during the maximum limitations period (the "FLSA collective").

[2]     Ms. DiFlavis brings this claim on an opt-out, class action basis pursuant to Fed. R. Civ. P. 23 on behalf of herself and all Pennsylvania residents who have worked as full-time, hourly Clarion Hotel housekeepers and been denied overtime premium wages for overtime hours worked during the maximum limitations period.

1

Hotels International, Inc. was her joint employer under the FLSA because (1) Rama operated the hotel under a franchise agreement with Choice Hotels; (2) Choice Hotels created the employment policies contained in the Employee Handbook and other documents relating to her employment; and (3) her supervisors were employed by Choice Hotels.  Choice Hotel counters that the franchise agreement does not contain any provision authorizing it to maintain the control over housekeepers necessary to establish a joint employer relationship.  Both defendants assert that the Employee Handbook and employment-related documents Ms. DiFlavis relies on to support her claim were created by Rama, not Choice Hotel.  Similarly, the defendants contend that Ms. DiFlavis' supervisors are solely employed by Rama.

Finally, Ms. DiFlavis moves for conditional certification of an FLSA collective action on behalf of herself and all Clarion Hotel housekeepers who have worked on a full-time, hourly basis during the maximum limitations period.  The defendants argue that Ms. DiFlavis fails to present any evidence that allows the Court to infer that other Clarion Hotel housekeepers, at the Essington location and nationwide, are subjected to the same allegedly unlawful policies and practices.

For the reasons outlined in this Memorandum, the Court grants summary judgment in favor of Choice Hotels, denies summary judgment in favor of Rama, and denies granting conditional certification.

## BACKGROUND

### A. The Parties

Ms. DiFlavis was briefly employed as a full-time, hourly housekeeper at the Clarion Hotel & Conference Center in Essington, Pennsylvania before being terminated after failing to report to work for two consecutive days.  Ms. DiFlavis states that she worked at the Clarion Hotel from

2

early June 2018 until late August 2018.  According to the time records and pay stubs, Ms. DiFlavis was employed from June 27, 2018 to August 3, 2018.

Choice Hotels is a Delaware corporation based in Rockville, Maryland.  The company owns a dozen hotel and motel brands totaling about 6,400 properties worldwide, including roughly 300 Clarion Hotels in 39 states.

Rama is a Pennsylvania corporation based in Essington, Pennsylvania.  It owns and operates the Clarion Hotel in Essington where Ms. DiFlavis worked.

### B.  Ms. DiFlavis' Compensation Allegations

The housekeepers at the Clarion Hotel in Essington are required to clean hotel rooms. Housekeepers, *inter alia*, make beds, replace towels, vacuum, and clean hotel rooms.  Full-time housekeepers are scheduled to work five 8 ½ hour shifts per week, with each shift including a 30-minute meal break.  The scheduled shifts run from 8:00 a.m. to 4:30 p.m. Mondays through Saturdays and 9:00 a.m. to 5:30 p.m. on Sundays.  At the start of each work day, housekeepers are given a list of 16 or more rooms, and supervisors can add to this list throughout the day. Housekeepers must work until they have serviced all of their assigned rooms per day.  Ms. DiFlavis contends that her supervisors routinely added additional rooms to her list as the day went on.

Housekeepers are paid an hourly rate of $9.00 plus $5.00 per each additional room they service above 16 rooms in a day.  Pursuant to the Employee Handbook, housekeepers are paid an overtime rate of $13.50 per hour worked in excess of 40 hours per week.  The Employee Handbook provides that the hotel's general policy is to avoid overtime and requires department head approval for any overtime hours worked.  Ms. DiFlavis testifies that she was never informed either in writing or verbally of such a policy.

3

Ms. DiFlavis asserts that although on average she worked five shifts per week, cleaned 20 to 22 guest rooms per day, and worked 10 to 11 hours per day, or 50 to 55 hours per week, the defendants never compensated her for the overtime hours she worked.  She points out that Rama's time clock was broken during her first couple weeks of her employment.  During this time period, employees or supervisors would handwrite when housekeepers began and stopped working for the day.  According to Ms. DiFlavis, the defendants are aware that they violated their own overtime policy because of their general ownership and management of the hotels, creation of the job description and relevant policies, control over staff schedules and assignments, and control over the timekeeping system.

The defendants, however, contend that Ms. DiFlavis never worked more than 40 hours during any week, as shown in time records and pay stubs.  Rama's time records show that Ms. DiFlavis worked at the hotel 26 times during a six-week employment, working between 17.75 and 39.25 hours during those six weeks.[3]  Oreta Brooks, the Housekeeping Manager at the Clarion Hotel in Essington and Ms. DiFlavis' direct supervisor, stated that Ms. DiFlavis never reported that her paycheck inaccurately reflected her hours or that she was not paid for hours she worked.

### C. The Franchise Agreement and Clarion Rules and Regulations

Franchisee Rama entered into a franchise agreement with franchisor Choice Hotels to operate the Clarion Hotel in Essington.  In the franchise agreement, Rama acknowledged and agreed that it was an "independent contractor" and "solely responsible for exercising ordinary business control over the Hotel, including personnel matters of Hotel employees."  Franchise Agreement at § 19(c) (Doc. No. 57-1).  Rama, through written admissions, and Choice Hotels,

---

[3]     Specifically, the time records show that Ms. DiFlavis worked 39.25 hours during her first week, 38.5 hours during her second week, 37.5 hours during her third week, 37.75 hours during her fourth week, 34 hours during her fifth week, and 17.75 hours during her sixth week.

through the declaration of Stuart Kriendler, Choice Hotel's Assistant General Counsel, state that Choice Hotels had no part in various aspects of the employment of Ms. DiFlavis or any other housekeepers.

Under the franchise agreement, Rama must comply with the Clarion Rules and Regulations which "contain[], among other things, [Choice Hotels'] standards and requirements for constructing, equipping, furnishing, supplying, operating, maintaining and marketing the hotel." *Id.* at § 1(k). Ms. DiFlavis contends that requiring Rama to comply with the Clarion Rules and Regulations demonstrates Choice Hotels' control over the employment of Ms. DiFlavis and other housekeepers. Mr. Kreindler asserts that the requirements Choice Hotels places on Rama and its other Clarion-brand franchisees "are designed to ensure that franchisees maintain and adhere to brand standards for the Clarion brand." Kreindler Dep. I at ¶ 4 (Doc. No. 57-4).

According to Ms. DiFlavis, the following provisions from the franchise agreement, *inter alia*, demonstrate Choice Hotels' control over her and all other housekeepers' employment:

- Choice Hotels controls Rama's use of the Clarion Hotel "Brand Mark" and the Choice Hotels "Choice Mark."

- Choice Hotels licenses an automated property management system to Rama. Rama is required to use this system for operation and management purposes.

- Choice Hotels maintains and requires Rama to use an automated reservation system.

- Choice Hotels permits Rama to use its Clarion Hotel license.

- Choice Hotels charges Rama fees for services it provides.

- Choice Hotels requires Rama to prepare "complete and accurate records concerning Gross Room Revenues and all financial, operating, markets and other aspects of the Hotel specified by [Choice Hotels from time to time ("Hotel Data")." Franchise Agreement at § 4(d) (Doc. No. 57-1). Choice Hotels may also "verify information required under the [franchise agreement] by requesting, receiving, inspecting, copying and auditing the Hotel Data and any and all records or documents related to the Hotel Data[.]" *Id.* at § 4(e).

5

- Choice Hotels requires Rama to maintain a "Quality Assurance" program, which includes periodic visits to the hotels to ensure compliance with the Clarion Rules and Regulations and guest satisfaction surveys.

- Choice Hotels requires Rama to operate the hotel by following high ethical and moral standards.

- Choice Hotels requires Rama's general managers to attend training programming.

- Choice Hotels is allowed to sell or assign its rights or obligations under the franchise agreement but Rama may not.

- Choice Hotels set forth specific provisions concerning when it may terminate the franchise agreement with Rama. Rama may also terminate the agreement if Choice Hotels defaults in its material obligations and if Rama gives proper notice. The franchise agreement enumerates various obligations Rama has if the franchise agreement is terminated.

- Choice Hotels requires Rama to maintain insurance.

- Choice Hotels requires indemnification, arbitration, and attorney's fees if Rama disputes the franchise agreement.

- Choice Hotels may enter Rama's hotel to evaluate its compliance with the franchise agreement and the Clarion Rules and Regulation.

- Rama must complete renovations as necessary to comply with the standards set forth in the Clarion Rules and Regulations and systems used.

Ms. DiFlavis did not submit any evidence pertaining to any other franchise agreement Choice Hotel entered into with any other Clarion-brand franchisee.

### D. Other Allegations Concerning Choice Hotels' Role as a Joint Employer

Ms. DiFlavis contends that because Clarion Hotel is a chain, every other Clarion Hotel housekeeper in the nation must receive the same Employee Handbook and other employment-related documents that she received during her employment. According to Ms. DiFlavis, all other Clarion Hotels housekeepers are therefore subjected to common policies and procedures and face the same issues receiving compensation for overtime work. The defendants assert that the compensation policies at issue apply only to the Clarion Hotel in Essington, and housekeepers at

other locations are not subjected to the same wage and hour policies.  The defendants contend that the Employee Handbook and other employment-related documents Ms. DiFlavis relies on were created and maintained by Rama, not Choice Hotels.

The parties agree that Ms. Brooks was Ms. DiFlavis' direct supervisor and hired, fired, supervised on a day-to-day basis, and disciplined Ms. DiFlavis.  The parties dispute whether Rama or Choice Hotels employed Ms. Brooks and Ms. DiFlavis' other supervisors, Tenasha Miller and Katrina Hemmings.

DISCUSSION

## I.      Summary Judgment Legal Standard

A court can grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might well affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).  Under Rule 6 of the Federal Rules of Civil Procedure, the Court must view the evidence presented in the motion in the light most favorable to the non-moving party and draw all evidences in that party's favor. *Id.*  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Where the non-moving party bears the burden of proof on a particular issue, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, the non-moving party then must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(C). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## II.     Summary Judgment Pertaining to the Alleged Joint Employer Relationship

Choice Hotels argues that it does not have a joint employer status with Rama concerning Ms. DiFlavis as a matter of law. "The basic prerequisite for any FLSA lawsuit is an employment relationship between the plaintiffs and defendant." *Davis v. Abington Mem'l Hosp.*, 817 F. Supp. 2d 556, 563 (E.D. Pa. 2011) (citing 29 U.S.C. § 203(e)(1)). Under the FLSA, an employer is broadly defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d); *see also Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 467 (3d Cir. 2012) ("Under this theory, the FLSA defines employer expansively and with striking breadth.") (internal citations and quotations omitted).

One person may be an employee for two or more employers at the same time. 29 C.F.R. § 791.2(a); *see also Enterprise Rent-A-Car*, 683 F.3d at 467. However, the determination of "joint employer" status requires more. Indeed, a "joint employment relationship can exist when

8

employers are not 'completely associated' with respect to the employment of individuals, or where one employer is controlled by another, or the employers are under common control." *Davis*, 817 F. Supp. 2d at 563 (citing 29 C.F.R. § 791.2(b)). "A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." 29 C.F.R. § 791.2(a); *see also Enterprise Rent-A-Car*, 683 F.3d at 467.

The Court of Appeals for this Circuit concluded in *Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462 (3d Cir. 2012) "that 'where two or more employers exert significant control over the same employees—[whether] from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute joint employers' under the FLSA." *Id.* at 468 (quoting *N.L.R.B. v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1124 (3d Cir. 1982) (alteration in original)). "Significant control" can arise from an indirect relationship. *Id.*

In determining whether an employer-employee relationship exists, courts should consider whether the alleged employer has: "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." *Id.* at 469. "When a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party." *Id.* at 471. Courts should also consider the "total employment situation" and "economic realities of the work relationship" instead of strictly or narrowly considering the listed factors. *Id.*

9

Pennsylvania courts widely recognize that the PMWA "substantially parallels" the FLSA. *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 613 (E.D. Pa. 2015).  Accordingly, the Court analyzes Ms. DiFlavis' PMWA claims following the *Enterprise* analysis.

### A. Authority to Hire and Fire Employees

The Court first considers whether Choice Hotels has the authority to hire and fire employees at the Clarion Hotel in Essington or elsewhere.  Although Ms. DiFlavis asserts that Choice Hotels retains broad authority to hire and fire employees pursuant to the franchise agreement, the franchise agreement does not contain any provision that pertains to hiring and firing employees.  Ms. Kreindler states in his declaration that "Choice Hotels has no authority to hire or fire Housekeepers employed by Clarion franchisees."  Kreindler Decl. II at ¶ 9 (Doc. No. 66-1). Rama also admits that it solely terminated Ms. DiFlavis' employment and that Choice Hotels played no role in Ms. DiFlavis' termination.

The parties agree that Ms. Brooks hired and fired Ms. DiFlavis in accordance with the policies enumerated in the Employee Handbook.  The parties, however, dispute which entity employs Ms. Brooks and developed the Employee Handbook and other documents relating to Ms. DiFlavis' employment.

The Court first considers evidence addressing which entity employed Ms. Brooks.  In her affidavit, Ms. Brooks confirms that she is only employed by Rama and is not currently, nor has she ever been, employed by Choice Hotels.  Ms. Brooks also states that Tenasha Miller and Katrina Hemmings, Ms. DiFlavis' other supervisors, are Rama employees and have never been Choice Hotels employees.

Ms. DiFlavis testifies that she and her supervisors, to "the best of [her] knowledge," DiFlavis Dep. at 32:15-16 (Doc. No. 52-4), work for Choice Hotels for the following reasons:

(1) "every time [Ms. DiFlavis] got information,[4] [Choice Hotels'] name was on it,"[5] *id.* at 32:16-17; (2) the shampoos and soaps were marked with the Choice Hotels logo; (3) Ms. Brooks told her that Choice Hotels bought the Essington hotel; and (4) Ms. Brooks informed Ms. DiFlavis about a discount for employees that can be redeemed at all Choice Hotels. Ms. DiFlavis testifies that she does not actually know whether Rama or Choice Hotels employs Ms. Brooks. When asked if Ms. Brooks told her that she worked for Choice Hotels, Ms. DiFlavis responded, "I don't recall her exact words." *Id.* at 38:18-22. Mr. Brooks states that she "never told Ms. DiFlavis that she worked for Choice Hotels." Brooks Aff., Choice Hotels' Ex. F, at ¶ 14 (Doc. No. 43-1).

Ms. DiFlavis' assumptions that Ms. Brooks must be employed by Choice Hotels are insufficient to create a genuine material dispute concerning who employs Ms. Brooks and Ms. DiFlavis' other supervisors. Rather, the material evidence demonstrates that Rama, not Choice Hotels, employs Mses. Brooks, Miller, and Hemmings.

The Court next considers evidence as to which entity created the Employee Handbook and other documents pertaining to Ms. DiFlavis' employment. All of these documents display the Clarion Hotel logo. In her declaration, Ms. DiFlavis speculates that because Clarion Hotels is a "chain operation," the Employee Handbook and other various documents must have been created by Choice Hotels and disseminated nationwide to all other Clarion Hotel employees. DiFlavis

---

[4]     The Court understands Ms. DiFlavis' reference to "information" to include the Employee Handbook, the document describing the housekeeper position, her job application, and other employment-related documents.

[5]     Every employment-related document has a Clarion Hotel logo, not a Choice Hotels logo. Nor do any of the employment-related documents reference Choice Hotels in its language. "If testimony is 'blatantly contradicted by the record,' then 'a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Berrada v. Cohen*, No. 19-1152, 2019 WL 5618181, at *2 (3d Cir. Oct. 31, 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Therefore, the Court does not adopt Ms. DiFlavis' version of the facts that every document she received had a Choice Hotels logo or included language referencing Choice Hotels.

Decl. at ¶ 5 (Doc. No. 53-6).  Ms. DiFlavis does not explain how she possesses personal knowledge

regarding which entity created these documents.  *See* FED. R. CIV. P. 56(c)(4) ("A . . . declaration

used to . . . oppose a motion must be made on personal knowledge[.]"); *Olympic Junior, Inc. v.*

*David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972) ("Conclusory statements, general denials,

and factual allegations not based on personal knowledge would be insufficient to avoid summary

judgment.").  Rather, her statements are based on speculation.  *See Lexington Ins. Co. v. Western*

*Pennsylvania Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a *genuine*

issue of fact.") (citation omitted).

Choice Hotels, however, points to multiple pieces of evidence to demonstrate that Rama

indeed created the documents at issue.  The very text of the Employee Handbook welcomes

employees to "*Rama Construction, Inc.*, d/b/a Clarion Hotel."  Employee Handbook at p. 5 § 1.1

(Doc. No. 53-7).  In her affidavit, Rama's Human Resources Manager, Barbara Gumbs, detailed

Rama's drafting of the current Employee Handbook and stated that "[a]ny and all handbooks

distributed to Rama employees were prepared at the direction of Rama management, not Choice

Hotels International, or any other Franchisor."  Aff. Gumbs at ¶ 20 (Doc. No. 57-3).  Moreover,

she stated that the Employee Handbook was only distributed to Rama employees at the Clarion

Hotel in Essington.  Mr. Kreindler's declaration also provides:

> The Employee Handbook produced by Rama in this lawsuit is not a
> Choice Hotels document, was not created by Choice Hotels and
> Choice Hotels did not distribute the Employee Handbook to Rama.
> The policies contained therein – including but not limited to
> compensation, working hours, pay periods, time recording and
> overtime policies – are not Choice Hotels policies.

Kreindler Decl. I at ¶ 6 (Doc. No. 57-4).  Mr. Kriendler confirms that "Choice Hotels does

not provide employee handbooks or manuals" to the employees of any of its Clarion franchisees.

Kreindler Decl. II at ¶ 6(c) (Doc. No. 66-1).  Mr. Kreindler also declares that the job description

document Ms. DiFlavis points to "is not a Choice Hotels document, was not created by Choice Hotels and was not distributed to Rama by Choice Hotels." Kreindler Decl. at ¶ 6 (Doc. No. 57-4). Ms. Brooks states that that the job description and the other various onboarding documents signed by Ms. DiFlavis—including a personnel authorization form, W-4 Form, emergency contact form, job application, acknowledgments concerning various policies and receipt of the Employee Handbook, direct deposit form, and name tag request—were documents produced and maintained by Rama. Therefore, the evidence shows that the Employee Handbook and other employee documents Ms. DiFlavis relies on to support her claim were indeed created by Rama, not Choice Hotels.

Because Ms. DiFlavis fails to cite any evidence demonstrating that Choice Hotels has any authority to hire and fire housekeepers at the Essington hotel or any other Clarion Hotel, this factor weighs against establishing a joint employment relationship.

### B. Authority to Promulgate Work Rules and Assignments and Set Conditions of Employment, Including Compensation, Benefits, and Hours

The Court next assesses whether Choice Hotels has the authority to promulgate work rules and assignments and set conditions of employment, including compensation, benefits, and hours for Ms. DiFlavis or any other Clarion Hotel housekeepers. Ms. DiFlavis generally asserts that Choice Hotels, through its franchise agreement with Rama, retains broad authority to set work rules, work assignments, and conditions of employment at the Essington hotel and other Clarion Hotels.

#### 1. Work Rules

In his declaration, Mr. Kriendler states that Choice Hotels has no authority to promulgate work rules for any housekeeper employed by any Clarion-brand franchisee. Rama also admits that Choice Hotels did not promulgate day-to-day work rules for Ms DiFlavis or other housekeepers

13

at the Essington hotel. As noted, the Employee Handbook, job description, job application, and the signed acknowledgements of the Equal Employment Opportunity Policy and Sexual Harassment Policy, the "Acts of Gross Misconduct/Causes for Immediate Dismissal" Policy, and receipt of the Employee Handbook setting forth such work rules are all Rama documents.

Ms. DiFlavis counters that, pursuant to the franchise agreement, Rama must comply with various Clarion Rules and Regulations which set work rules for housekeepers. In particular, Ms. DiFlavis points to the "Housekeeping & Maintenance Service Standards," which instruct the franchisee's housekeepers to perform 16 "typical daily duties/responsibilities" of a housekeeper and uniformly service all occupied rooms on a daily basis. The Rules and Regulations also require the franchisee to post the "Room Condition 36 Element" cleaning standards poster and encourage the use of online resources including "detailed instructions for cleaning a room" and housekeeping forms. The enumerated "typical daily duties/responsibilities" include, *inter alia*, vacuuming, sweeping, dusting, cleaning, changing linens, replenishing guest amenities and supplies, and inspecting the room for safety hazards. According to the Clarion Rules and Regulations, these standards are put in place because "[a] clean, fresh-looking and properly stocked room is essential to a positive guest experience. A housekeeper's work is critically important to guarantee that [Clarion Hotel] guests leave with a positive, lasting impression." Clarion Rules and Regulations at § 130.4(B). The Court concludes that such familiar hospitality facilities standards are ultimately implemented to maintain the Clarion Hotel *brand*, not to control particular working conditions and responsibilities of housekeepers.

### 2. Work Assignments

Mr. Kriendler similarly states that Choice Hotels has no authority to promulgate work assignments or schedules for any housekeepers employed by Clarion-branded franchisees. Rama again admits that Choice Hotels did not set Ms. DiFlavis'—or any other housekeepers'—work

14

schedules. Mses. Brooks and Miller, Rama employees, set Ms. DiFlavis' work schedule. Ms. Brooks would assign Ms. DiFlavis work assignments, namely though her "morning speeches" given to all housekeepers at the Essington hotel. In responding to Choice Hotels' statement of undisputed facts, Ms. DiFlavis admits that Rama controlled Ms. DiFlavis' schedule. Pl.'s Resp. to Stat. of Undisputed Facts at ¶ 66(a) (Doc. No. 54-2) (admitting that "Rama produced documents reflecting such schedules, wherein Rama scheduled Plaintiff to work various 8:00 a.m.-4:30 p.m. shifts."); Pl.'s Interrog. Resp. Choice Hotels Ex. J, at ¶ 13 (Doc. No. 43-2) ("Rama scheduled Plaintiff to work an 8 ½-hour shift.").

### 3. Conditions of Employment Including Compensation, Benefits, and Hours

Mr. Kriendler states that Choice Hotels has no authority to set compensation, benefits, or rates or methods of payment for housekeepers employed by any Clarion franchisees. He states that Choice Hotels does not provide any human resources function for its Clarion-branded franchisees. Specifically, Mr. Kriendler states that "Choice Hotels does not control, dictate or otherwise make any recommendations, in any way, to its franchisees with respect to the pay rates, salary ranges, exempt versus non-exempt status, overtime or any other wage and hours consideration for Housekeepers employed by Clarion franchisees" nor does it "provide employee benefits plans" to its franchisees. Kreindler Decl. II at ¶ 6(a)-(b) (Doc. No. 66-1).

Rama again admits that Choice Hotels did not set the compensation, benefits, rate of pay, or method of payment of Ms. DiFlavis or other housekeepers working at the Clarion Hotel in Essington or elsewhere. Rama also admits that the Essington hotel's "$5 for each extra room" policy originated from a collective bargaining agreement not involving Choice Hotels. *See* Collective Bargaining Agreement, Choice Hotels Ex. H, at § 19.8 (Doc. No. 43-2). The Essington hotel's compensation, benefits, and hours provisions are detailed in the Employee Handbook and

job description created by Rama.  Ms. Brooks declared that "Rama does not utilize any method offered or provided by or through Choice Hotels" when training its housekeeping managers, supervisors, or staff on wage and hour policies and practices  Brooks Aff., Choice Hotels' Ex. F, at ¶¶ 10-11 (Doc. No. 43-1).  Ms. Brooks and Ms. Agosto, a fellow employee, explained the wage policies to Ms. DiFlavis.

In her response to Choice Hotels' statement of undisputed facts, Ms. DiFlavis admits that "*Rama's* Human Resources Director Barbara Gumbs and *Rama's* Housekeeping Manager Oreta Brooks" are primarily responsible for the wage and hour policies and practices at the hotel.  Pl.'s Resp. to Stat. of Undisputed Facts at ¶ 35(a) (Doc. No. 54-2) (emphasis added).  Ms. DiFlavis also testified that she is unaware of which entity created the $9 per hour pay and $5 extra room policy.

Even so, Ms. DiFlavis maintains that the minimum standards, procedures, rules, regulations, policies, and techniques of the Clarion Hotel system set forth in the Clarion Rules and Regulations equate to Choice Hotels' control over employment compensation, benefits, and hours. In doing so, Ms. DiFlavis fails to point to any specific provision of the Clarion Rules and Regulations that pertains to compensation, benefits, and hours.  The only compensation, benefits, and hours provisions she does cite are contained in the Employee Handbook and job descriptions created by Rama.

This factor weighs against determining that a joint employer relationship or status existed.

**C. Supervision of Day-to-Day Work**

The Court next assesses whether Choice Hotels supervises Ms. DiFlavis' day-to-day work.  Mr. Kriendler states that "Choice Hotels has no involvement with day-to-day supervision or discipline" of any housekeeper employed by any Clarion franchisee.  Kreindler Decl. II at ¶ 11 (Doc. No. 66-1).  Rama admits that (1) Choice Hotels was not involved in the day-

16

to-day supervision of Ms. DiFlavis or other housekeepers' employment at the Essington hotel and (2) Choice Hotels did not and could not discipline Ms. DiFlavis or other housekeepers working at the Clarion Hotel in Essington.  The parties agree that Ms. Brooks, primarily, alongside Mses. Miller and Hemmings, supervised Ms. DiFlavis on a day-to-day basis.  As Ms. DiFlavis direct supervisor, Ms. Brooks disciplined Ms. DiFlavis during the course of her employment.

Ms. DiFlavis argues that Choice Hotels, under the franchise agreement, retained broad authority to supervise the Essington hotel employees' performance through audits, guest satisfaction surveys, consultation services, general manager's participation in required trainings, and evaluations into Rama's compliance with the franchise agreement.  None of these provisions, however, go toward Choice Hotel's day-to-day supervision over housekeepers at the Essington hotel or other Clarion Hotels.  Rather, these provisions focus on maintaining brand standards through limited, non-routine audits and evaluations.  Therefore, this factor also weighs against determining that a joint employer relationship or status existed.

### D.  Actual Control of Employee Records, Including Payroll, Insurance, Taxes, and the Like

The last of the enumerated *Enterprise* factors considers whether the alleged joint employer has actual control of employee records, including payroll, insurance, taxes, and the like.  Mr. Kriendler declares that "Choice Hotels does not have actual control of the employee records" of housekeepers employed by any Clarion franchisees nor does it provide insurance for Clarion franchisees.  Kreindler Decl. II at ¶¶ 7, 12 (Doc. No. 66-1).  Rama admits that Choice Hotels did not and does not exert actual control over the employment records kept with respect to Ms. DiFlavis or any other housekeepers at the Clarion Hotel in Essington, including Ms. DiFlavis' W-2 Form.  Rama acknowledges that it issued Ms. DiFlavis' W-2 form for the 2018 tax year and other housekeepers at the hotel.  In hiring and onboarding Ms. DiFlavis, Ms. Brooks, as a Rama

17

employee, facilitated gathering and completing Ms. DiFlavis' onboarding documents, including her tax and direct deposit authorization forms.  The Court notes apart from the pay stubs that Ms. DiFlavis' produced, Rama produced all employment records in this case (time sheets, schedules/calendars, supervisory notes, etc.).

Ms. DiFlavis points to a provision in the franchise agreement which requires Rama to prepare on a current basis "complete and accurate records concerning Gross Room Revenues and all financial, operating, marketing and other aspects of the Hotel specified by us from time to time ("Hotel Data")."[6] Franchise Agreement at § 4(d) (Doc. No. 57-1).  The franchise agreement allows Choice Hotels to "verify information required under this Agreement by requesting, receiving, inspecting, copying and auditing the Hotel Data and any and all records or documents related to the Hotel Data wherever they may be located." *Id.* at § 4(e).  According to Ms. DiFlavis, such provisions allow Choice Hotels to possess actual control of her and other housekeepers' employment records.  The Court disagrees that Choice Hotels' ability to review and audit financial records constitutes or translates into its actual control over employee records intended to establish a joint employer relationship.  *See, e.g.*, *Reese v. Coastal Restoration & Cleaning Serv., Inc.*, No. 10-36, 2010 WL 5184841, at *5 (S.D. Miss. Dec. 15, 2010) (finding franchise agreement provisions requiring franchisee to provide franchisor information pertaining to the franchisee's "business under the franchise agreement, information which allows [the franchisor] to assess the viability of a franchise, to compute the royalties and fees due it from the franchise, and to ensure the future value of its trademark, proprietary system information, and quality associated with the

---

[6]      Pursuant to the franchise agreement, "Hotel Data includes all bank statements, federal tax returns, state tax returns, local occupancy tax returns, daily revenue reports, monthly and annual revenue summary reports, mail logs, guest registration folios and complete annual financial statements (profit and loss statements, balance sheets and cash flow statements)."  Franchise Agreement at § 4(d)(Doc. No. 57-1).

[franchisor's] brand name" did not establish franchisors' "maintenance of employment records[.]").

Ms. DiFlavis also asserts that because the franchise agreement requires Rama to purchase various insurances, Choice Hotels must therefore control her insurance records. The franchise agreement requires Rama to purchase and maintain various insurance coverages, including commercial general liability insurance, all-risk builder's risk coverage, and all-risk physical damage coverage, and business interruption insurance. It is unclear how these requirements pertain to Ms. DiFlavis' and other housekeepers' insurance.

The Court finds this factor to also weigh against determining that a joint employer relationship existed.

### E.  Additional Considerations

As noted, the Court also considers the "total employment situation" and "economic realities of the work relationship" instead of strictly or narrowly considering only the listed factors. *Enterprise Rent-A-Car*, 683 F.3d at 469. Ms. DiFlavis argues that the Court should recognize two additional considerations.

First, Ms. DiFlavis reminds the Court that the FLSA applies a very broad definition of employer. *See Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014). Indeed, it does. Although the Court acknowledges the FLSA's broad definition, such a definition does not mean that an entity should be deemed a joint employer based on wholly insufficient evidence and unsupported assertions.

Second, Ms DiFlavis reasserts her general argument that Choice Hotels apparently maintained an "exceptional degree of control . . . over every aspect of its franchisees' business

19

operations." Pl.'s Resp. in Opp'n to Choice Hotels' Mot. for Summ. J. at 20 (Doc. No. 54-3) at 20. This general assertion has already been thoroughly addressed in the above *Enterprise* analysis.

Finally, the Court points out that Rama operates as an independent contractor pursuant to the franchise agreement. In doing so, Rama "acknowledge[s] and agree[s] that [it is] solely responsible for exercising ordinary business control over the [Essington] Hotel, including personnel matters of Hotel employees . . . ." Franchise Agreement at § 19(c) (Doc. No. 57-1). This language similarly suggests that no joint employer relationship existed.

These additional considerations similarly weigh against determining that Choice Hotels was Ms. DiFlavis' joint employer.

### F. Conclusion

After applying the *Enterprise* analysis and reviewing additional considerations, the Court determines as a matter of law that there is no joint employer relationship between Rama and Choice Hotels over Ms. DiFlavis. The Court grants summary judgment in favor of Choice Hotels regarding Ms. DiFlavis' FLSA and PMWA claims.

### III.   Summary Judgment Pertaining to Ms. DiFlavis' Compensation Allegations

Both Choice Hotels and Rama argue that the Court should grant summary judgment in their favor because Ms. DiFlavis fails to offer sufficient evidence to support her overtime compensation claims. Because the Court grants Choice Hotels' summary judgment on the joint employment grounds discussed above, the Court's analysis here is limited to Rama.

### A. Estimating a Proximate Overtime Compensation Award

Ms. DiFlavis contends that her evidence is sufficient to support her overtime compensation estimation and that such estimation need not be as precise as the defendants suggest. Ms. DiFlavis'

20

PMWA claims will be assessed in conjunction with the following FLSA analysis. *See Ford-Green*, 106 F. Supp. 3d at 613.

"The FLSA requires that employers pay their employees one and one-half times their regular rate of pay for any hours worked in excess of forty hours per week." *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 277 (3d Cir. 2010). An employer who fails to properly pay their employees overtime wages is "liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation, as the case may be, and in additional equal amount as liquidated damages." 29 U.S.C. § 216(b); *Davis*, 765 F.3d at 241.

An employee asserting a claim under the FLSA "ordinarily bears 'the burden of proving that he performed work for which he was not properly compensated.'" *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 188 (3d Cir. 2014) (quoting *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946), *superseded by statute*, Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-62, *as recognized in IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-26 (2005)). The FLSA requires employers to keep records of "the wages, hours, and other conditions and practices of employment." 29 U.S.C. § 211(c). "When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Mt. Clemens*, 328 U.S. at 687. "In the absence of adequate employer records of employees' wages and hours, as required by the FLSA, the solution is not to penalize the employees by denying recovery based on an inability to prove the extent of undercompensated work, but rather to allow the employee . . . to submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991) (citing *Mt. Clemens*, 328 U.S. at 687); *see also Reich v. Gateway Press, Inc.*, 13 F.3d 685, 700 (3d Cir. 1994) (stating "it is settled that the burden (with respect to a given employee) is met if it is proved that the employee has in

21

fact performed work for which he was improperly compensated and if the employee produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference").

Once the employee satisfies her burden, the burden then shifts to the employer, who must provide evidence that sets forth the "precise amount of work performed" or that otherwise "negatives the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens.* 328, U.S. at 687; *see Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 558 (E.D. Pa. 2013) ("If the plaintiff sufficiently adduces evidence that [s]he worked overtime hours for which [s]he was not compensated, the burden of proof shifts to the defendant to provide evidence of the exact amount of time worked, or evidence that otherwise negates the inference to be gleaned from the plaintiff's evidence.") (citations omitted). If the employer cannot satisfy its burden, a court may then award an employee damages, even though "the result may only be approximate." *Martin,* 949 F.2d at 1297 (quoting *Mt. Clemens,* 328 U.S. at 687).

Here, Ms. DiFlavis argues that Rama's records must be inaccurate because they cannot reflect the time it took her to perform all of her daily activities. Ms. DiFlavis testimony allows the Court to infer that Ms. DiFlavis alleges that an inaccuracy in her time records may be a result of some type of manipulation of the data inputted into her time records. As noted, the time clock was also broken during the first couple weeks of her employment. Acknowledging that the just and reasonable inference standard is indeed applied in cases where the employer has not maintained any records,[7] the Court similarly acknowledges that the standard is also applied where employees

---

[7]     *See, e.g.*, *Martin*, 949 F.2d at 1291 ("Selker maintained no records of the wages, hours, and other conditions of employment for the station operators or for other persons employed at the stations."); *Jimenez v. Best Behavioral Healthcare, Inc.*, 391 F. Supp.3d 380, 393 (E.D. Pa. 2019) ("BBH appears to concede that it did not keep or produce detailed records of Mr. Jimenez's time working at BBH.").

challenge the accuracy of data inputted into time records. *Miller v. Wells Fargo Bank, N.A.*, No. 16-5597, 2018 WL 2445807, at **2-3 (E.D. Pa. May 31, 2018) (denying summary judgment in favor of employee after plaintiff offered a deposition and declaration explaining "that his manager instructed him not to report any hours worked in excess of forty."); *Musa v. Soar Corp.*, No. 13-2847, 2014 WL 6809019, at *2 (E.D. Pa. Dec. 1, 2014) (denying summary judgment when plaintiff testified that her accurate time records she entered herself would be subsequently "erased or manipulated" on the time-recording system). Because Ms. DiFlavis similarly questions the accuracy of her time records, both through potential manipulation and the absence of a functioning time clock during part of her employment, the Court assesses Ms. DiFlavis' claim to see whether she can offer evidence to support her overtime compensation claim that allows the Court to proximate an award amount as a matter of just and reasonable inference.

During her deposition, Ms. DiFlavis repeatedly testified that although she was not exactly sure how many overtime hours she worked, she was sure that she should have been compensated for time she worked in excess of 40 hours per week. *See, e.g.*, DiFlavis Dep. at 291:14-292:1 (Doc. No. 52-4) ("I'm not sure of the question because I don't know exact amount of hours. I know that I worked overtime and didn't get paid for it. I worked over 40 hours a week and didn't get paid overtime. That's what I know. That's it. That's why I'm here. There it is. I worked over 40 hours. I didn't get paid for the overtime that I worked.").[8]

However, Ms. DiFlavis states in her declaration that she worked an average of 10 to 11 hours per day or 50 to 55 hours per work while employed at the hotel. The Court notes that "[a]s

---

[8] Ms. DiFlavis also focuses on the fact that she left work after 4:00 p.m. every day during her first two weeks of employment and at least three other times during the remainder of her employment. Indeed, Ms. DiFlavis was *scheduled* to work until 4:30 p.m. or 5:30 p.m. on every work day. Her time records reporting that Ms. DiFlavis worked fewer than 40 hours per week also indicate that she left after 4:00 p.m. during her employment.

a general proposition, conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2018). When assessing an FLSA overtime compensation claim at the summary judgment stage, however, this Court has also relied on an employee's statements for the average amount of hours worked in a week. *Jimenez v. Best Behavioral Healthcare, Inc.*, 391 F. Supp.3d 380, 394 (E.D. Pa. 2019) (citing *Acosta v. Cent. Laundry, Inc.*, No. 15-1502, 2018 WL 1726613, at *3 (E.D. Pa. Apr. 10, 2018)). More specifically, this Court has done so even when an employee did not allege specific facts regarding how they reached their weekly hour estimation. *Id.* The Court determines that Ms. DiFlavis' estimation that she worked, on average, 50 to 55 hours per week sufficiently sets forth her estimation of average hours worked per week for purposes of surviving summary judgment.

During oral argument, Ms. DiFlavis' attorney further asserted that Ms. DiFlavis must have worked approximately 50 to 55 hours per week based on the number of rooms she cleaned and the time it took her to clean these rooms. As for the former, Ms. DiFlavis' evidence shows that she serviced, on average, anywhere from 16 to 22 rooms per day.[9] Ms. DiFlavis testifies that it took her approximately anywhere between 25 minutes to under an hour to address each room. These figures, albeit varying, set forth sufficient evidence at the summary judgment stage for the Court to reasonably infer that Ms. DiFlavis could have worked 10 to 15 overtime hours per week.

Ms. DiFlavis next testified that, although uncertain of the exact date, she began working before the date she wrote down on her application, June 13, 2018. She insists that because the

---

[9]     Ms. DiFlavis testified that she, on average, serviced 16 rooms a day. DiFlavis Dep. at 97:11-15 (Doc. No. 52-4). She also testified that she serviced approximately 22 additional rooms over the 16 rooms daily minimum during only first two weeks of employment. *Id.* at 191:8-121:22. This estimate equates to Ms. DiFlavis servicing an average of 18.2 rooms per day during her first two weeks of employment. In her declaration, Ms. DiFlavis then states that she serviced an average of 20 to 22 rooms per day. DiFlavis Decl. at ¶ 10 (Doc. No. 53-6).

time clock was broken during the beginning days of her employment, her work days at the beginning of her employment, including her start date, are not accurately reflected on her time records. As for her last day, Ms. DiFlavis rejected that her time records accurately reflected that August 3, 2018 was her last day working at the hotel. She could only confirm at her deposition that she last worked in August. In her declaration, Ms. DiFlavis states that she worked at the hotel from early June 2018 to late August 2018. As noted, this Court has credited a plaintiff's declaratory statements to satisfy the just and reasonable inference standard.

Courts have also reasonably inferred compensation calculations even when the precise length of employment is disputed or otherwise unclear. *See, e.g.*, *Cent. Laundry, Inc.*, 2018 WL 1726613, at *5 ("Although the parties agree that Ms. Sanchez was employed by Central Laundry starting in November 29, 2013, they dispute the end date. It may reasonably be inferred that Ms. Sanchez worked until at least August 2, 2014, based on the declaration of another Central Laundry employee[.]"). Thus, the Court here is able to reasonably infer that Ms. DiFlavis—at the very least—worked from June 13, 2018 to August 3, 2018. The Court determines that Ms. DiFlavis' estimation of her weeks worked, again albeit inconsistently described, provides the Court at least enough information to reasonably infer a proximate damages award. In doing so, the Court stresses that leniency should be afforded to employees alleging improper overtime wage compensation by an employer who allegedly fails to maintain adequate, accurate time records or recording devices.

Because Ms. DiFlavis submits sufficient evidence of potential FLSA and PMWA violations and an award amount that can reasonably be inferred, the Court next inquires whether Rama's evidence can so clearly forth the precise amount of work performed or that otherwise negatives the reasonableness of the inference to be drawn from the employee's evidence that no reasonable juror could find in Ms. DiFlavis' favor. *Mt. Clemens,* 328 U.S. at 687. Rama submits

time records suggesting that Ms. DiFlavis worked at the Essington hotel 26 times during a six-week employment, working between 17.75 and 39.25 hours during these six weeks. More specifically, Rama's evidence—including time records and various employment paperwork—suggests that Ms. DiFlavis applied for the housekeeper position on June 13, 2018, worked her first shift on June 27, worked her last shift on August 3, and was terminated on August 16. The five pay stubs Ms. DiFlavis produced match Rama's time records. Because Ms. DiFlavis challenges the accuracy of the very evidence that Rama relies on to establish the alleged precise amount of work Ms. DiFlavis performed, the Court determines that a jury should decide whether Ms. DiFlavis did indeed work more than 40 hours per week without overtime compensation.

### B. Rama's Actual or Constructive Knowledge of Ms. DiFlavis' Alleged Overtime Work

For her claim to survive past a summary judgment motion, Ms. DiFlavis must also demonstrate that Rama possessed either actual or constructive knowledge of her overtime work. *Alers*, 919 F. Supp. 2d at 558 (citation and internal citation omitted). "Where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the FLSA." *Gulick v. City of Pittston*, 995 F. Supp. 2d 322, 338 (M.D. Pa. 2014) (quoting *Stanislaw v. Erie Indem. Co.,* No. 07-1078, 2012 WL 517332, at *4 (W.D. Pa. Feb. 15, 2012) (quotation and citation omitted)). "An employer, however, may not stand idly by and permit an employee to work overtime without proper compensation, even in cases where the employee does not submit a claim for overtime compensation." *Gulick*, 995 F. Supp. 2d at 338 (citing *Forrester v. Roth's I.G. A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981)). In the event an employee does not want an employee to work overtime, "the employer is responsible to make

every effort to prevent the employee from working overtime." *Alers*, 919 F. Supp. 2d at 558 (citing *Prise v. Alderwoods Grp., Inc.*, 817 F. Supp. 2d 651, 662 (W.D. Pa. 2011)). "'This duty arises even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours.'" *Prise*, 817 F.Supp.2d at 662 (quoting *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008)). As long as the employer knows or has reason to know that the employee continued working, those overtime hours must be counted. *Gulick*, 995 F. Supp. 2d at 339.

Because Rama's argument focuses on its contention that Ms. DiFlavis never worked any overtime hours, it does not set forth any argument concerning its actual or constructive knowledge of its alleged improper practice.

Rama requires department head approval before an employee can work in excess of 40 hours per week. Ms. DiFlavis testifies that she has never seen such a policy nor was such a policy verbally communicated to her. This policy is included in the Employee Handbook, and no evidence suggests that Ms. DiFlavis ever sought approval to work any hours in excess of 40 hours per week. Even so, according to Ms. DiFlavis, Rama should have known that she worked more than 40 hours per week when assigning her additional rooms in excess of the 16 room per day minimum. As noted, each room took Ms. DiFlavis anywhere from 25 minutes to under an hour to service. Taking all facts and inferences in favor of Ms. DiFlavis, the Court determines that she has produced sufficient evidence to raise a genuine issue of material fact as to whether Rama knew or should have known that she worked overtime and that it failed to compensate Ms. DiFlavis for the hours she allegedly worked in excess of 40 hours per week.

For the foregoing reasons, the Court denies Rama's motion for summary judgment regarding Ms. DiFlavis' FLSA and PWMA claims.

27

IV.     **Ms. DiFlavis' FLSA Conditional Certification**

Ms. DiFlavis moves for conditional certification of the FLSA collective for leave to disseminate notice to every individual employed as a full-time Clarion Hotel housekeeper in the past three years. The FLSA authorizes an employee who has been denied overtime compensation to bring a claim on behalf of other "similarly situated" employees affected by an employer's common policy. 29 U.S.C. § 216(b). District courts in the Third Circuit determine whether a FLSA claim may proceed as a collective action in two steps: a conditional certification and a final certification determination. *See Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013) (citing *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 535-36 (3d Cir. 2012)). Ms. DiFlavis' motion concerns the initial conditional certification step.

At the conditional certification step, courts apply a "fairly lenient standard" in "mak[ing] a preliminary determination as to whether the named plaintiffs have made a modest factual showing that the employees identified in their complaint are similarly situated." *Camesi*, 729 F.3d at 243 (citations and quotation marks omitted).[10] To make a modest, but necessary, factual showing at this first step, "a plaintiff must produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees. The underlying question is the extent to which the claims of the putative class can be proven through common evidence, versus individualized testimony." *Banks v. Radioshack Corp.*, No. 13-685, 2014 WL 1724856, at *2 (E.D. Pa. Apr. 25,

---

[10]     In the event plaintiffs satisfy their burden, collective actions are conditionally certified "for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery." *Camesi*, 729 F.3d at 243 (citation omitted). At the final certification determination stage, a court considers discovery and "makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff." *Id.* (quoting *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011), *rev'd on other grounds*, *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66 (2013)).

2014) (internal citations and quotation marks omitted). "[T]he Court does not weigh the evidence, resolve factual disputes, or reach the merits of Plaintiff's claims . . . . The Court does not, however, review Plaintiff's evidence in a vacuum. It reviews Plaintiff's evidence in light of the evidence submitted by Defendants." *Reed v. Empire Auto Parts, Inc.*, No. 13-5220, 2015 WL 761894, at *3 (E.D. Pa. Feb. 23, 2015) (internal citations and quotation marks omitted).

A plaintiff's "[u]nsupported assertions of widespread violations are not sufficient." *Id.* at *4 (internal citations and quotation marks omitted). Instead of relying solely on the allegations in the complaint, the plaintiff "must instead provide factual support in the form of pleadings, affidavits, deposition testimony, or other supporting documents." *Id.* (citation omitted). Although the standard for granting conditional certification is "modest," "courts have not hesitated to deny conditional certification when evidence is lacking." *Rogers v. Ocean Cable Grp., Inc.*, No. 10-4198, 2011 WL 6887154, at *3 (D.N.J. Dec. 29, 2011) (citing *Dreyer v. Altchem Envtl. Serv., Inc.*, No. 6-2393, 2007 WL 7186177, at *3 (D.N.J. Sept. 25, 2007)).

Here, the Employee Handbook states that Rama's overtime compensation policy complies with the FLSA. Presumably, the unlawful conduct at issue is Rama's alleged practice of not following its own written policy.

*Wright v. Lehigh Valley Hosp.*, No. 10-431, 2010 WL 3363992 (E.D. Pa. Aug. 24, 2010) and its progeny are particularly instructive here. In *Wright*, the Court denied granting a plaintiff's conditional certification regarding a putative class of registered nurses who were allegedly not paid overtime. Denial was proper considering "[t]he conspicuous dearth of record evidence of a factual nexus between [the plaintiff's] experiences and those of other . . . nurses." *Id.* The Court noted that the plaintiff's "declaration include[d] conclusory allegations and fail[ed] to name a single nurse, include any of their pay stubs or time sheets or any other information that would allow this

29

Court to make even a preliminary finding that this litigation can proceed as a collective action." *Id.* It also rejected plaintiff's speculative assertion that because the employer's uniform policies and procedures (which state that the employer observed all application FLSA wage and hour regulations) violated her rights, they must have violated other employees' rights. *Id.* Although the plaintiff's allegations that her paychecks and stubs failed to accurately reflect the hours she worked could be used to support her individual claim, her "unsupported assertion" that other nurses must have also been subjected to these same conditions was insufficient to sustain her minimal burden. *Id.*

Other unsupported, generalized attempts at passing the initial conditional certification step have been similarly rejected. *See, e.g.*, *Goldstein v. Children's Hosp. of Phila.*, No. 10-1190, 2012 WL 5250385, at *3 (E.D. Pa. Oct. 24, 2012) (denying conditional certification where the plaintiff's "declaration makes reference to the circumstances of other employees with no particularity and in only the most general terms"); *Rogers*, 2011 WL 6887154, at *4 (denying conditional certification where plaintiffs' affidavits were "essentially asking the Court . . . to assume that because they worked in excess of 40 hours in a workweek that the other technicians must have as well"); *Armstrong v. Weichert Realtors*, No. 05-3120, 2006 WL 1455781, at *1 (D.N.J. May 19, 2006) (denying conditional certification where the Court could not determine from plaintiff's declaration whether the plaintiff "actually knew other particular officers who were required to perform unpaid overtime work, and what he knew specifically about their unpaid work").

Ms. DiFlavis' speculative, conclusory, and vague attempt at referencing similarly situated individuals likewise fails. Ms. DiFlavis generally names "every other Clarion Hotel Housekeeper" as a potential similarly situated individual. DiFlavis Decl. at ¶¶ 6-9 (Doc. No. 53-6). Ms. DiFlavis assumes that because her rights were allegedly violated, she is "confident that Housekeepers in

30

other Clarion Hotels had the same issue getting paid for their overtime work." *Id.* at ¶ 11. When

asked at her deposition if she has personal knowledge concerning how housekeepers employed at

other Clarion Hotel locations are compensated, Ms. DiFlavis stated:

> I know what I got paid. Why would it be different for anybody else?
> I just don't know why it would be different for anybody else. I see
> what I got paid. Why would I – I don't know why it would be
> different for any other Choice Hotels employees for the
> housekeeping. I don't know. I don't see why I should be singled
> out. It should be the same for everyone. Why wouldn't it be?

DiFlavis Dep. at 131:18-132:19 (Doc. No. 52-4). When specifically asked whether she

knew if any housekeepers at other Clarion Hotel locations are paid the $5 per extra room bonus

used at the Essington hotel, Ms. DiFlavis similarly testified:

> Why would it be different? . . .
>
> I'm not assuming it. Why would it not be the same for everyone as
> it is for me? Why would I be singled out? Why would I be singled
> out? Why would I get this and nobody else? . . .
>
> That's my answer. Why would it be different from anybody else?
> I'm a housekeeper. Why would any other housekeeper – you're
> asking me about another housekeeper. I know that this is what I got.
> This is me. Any why would I assume that anybody would be
> different from what I got?

*Id.* at 129:1-130:23. In addition to her candid assumption that every Clarion Hotel

housekeeper must be compensated in the same manner that she was compensated, Ms. DiFlavis'

argument is premised on her understanding that the Employee Handbook she received was

disseminated by Choice Hotels to every Clarion Hotel housekeeper in the nation. As noted, the

Employee Handbook, created by Rama and not Choice Hotels, is supplied only to the housekeepers

working at the Clarion Hotel in Essington. The Court rejects Ms. DiFlavis' unsupported assertions

that every Clarion Hotel housekeeper in the nation was subjected to the same allegedly unlawful

payment practice.

Ms. DiFlavis similarly fails to support any claim that all of the housekeepers at the Clarion Hotel in Essington were subjected to the same allegedly unlawful practices.  Indeed, Ms. DiFlavis fails to name a single similarly situated housekeeper at the Essington hotel.  Like the plaintiff in *Wright*, Ms. DiFlavis fails to include any pay stubs, time sheets, or any other information concerning other housekeepers that even remotely allows the Court to make any preliminary finding that this case can legitimately proceed as a collective action.

In her reply and at oral argument, Ms. DiFlavis asserts that two other housekeepers employed at the Essington hotel, "Joy" and "Ms. J" (Ms. Agosto), must have been subjected to the alleged unlawful compliance with policy.  After closely searching Ms. DiFlavis' depositions and other submissions, the Court confirms that Ms. DiFlavis presents no evidence demonstrating that she even spoke to either woman about their compensation.[11]  Indeed, Ms. DiFlavis explicitly denies ever speaking to Joy about her FLSA claims.  *See* DiFlavis Dep. 74:2-4 (Doc. No. 52-4) ("Q: Have you had any conversation with Joy about your claims?  A: No.").  Ms. DiFlavis' attempt to name similarly situated persons epitomizes the "[u]nsupported assertions of widespread violations" that are insufficient to support conditional certification.  *Reed*, 2015 WL 761894, at *3.  Although Ms. DiFlavis' allegations that her pay stubs inaccurately reflect the hours she worked can be used to support her individual claim, her assumption that other housekeepers be subjected to the same conditions is insufficient to meet even her modest burden.  Therefore, the Court denies Ms. DiFlavis' motion for conditional certification.

---

[11]     To the extent that Ms. DiFlavis' argument can be construed to assert that conditional certification should be granted merely because she can identify two other housekeepers employed at the Essington hotel, the Court cannot accept such an argument.

32

CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Choice Hotels regarding all of Ms. DiFlavis' claims, denies summary judgment in favor of Rama, and denies Ms. DiFlavis' conditional certification motion.  An appropriate order follows.


BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

33